Kevin Law Formal Opinion Chairman No. 2007-F4 Long Island Power Authority 333 Earle Ovington Boulevard Suite 403 Uniondale, New York 11553
Dear Mr. Law:
You have requested an opinion regarding certain uses of funds of the Long Island Power Authority (LIPA). First, you have indicated that LIPA currently pays bonuses to its employees based on LIPA reaching certain performance benchmarks. You have asked whether payment of these bonuses is legal. Second, LIPA makes financial contributions to local not-for-profit organizations and civic and business entities. You have asked whether these contributions may legally be made by LIPA. As explained more fully below, we conclude that payment of the bonuses to LIPA employees appears to be legal. Whether sponsorships of programs under the auspices of local organizations and charitable contributions are legal depends on the purpose for which the sponsorships or contributions are made.
Background
LIPA was established by title 1-A of the Public Authorities Law ("LIPA Act").[1] In creating LIPA, the Legislature made the following statement:
 The legislature hereby finds and declares that: *Page 2 
 Constantly escalating and excessive costs of electricity in the counties of Suffolk and Nassau and that portion of the county of Queens served by the Long Island lighting company (hereinafter referred to as the "service area") pose a serious threat to the economic well-being, health and safety of the residents of and the commerce and industry in the service area.
 There is a lack of confidence that the needs of the residents and of commerce and industry in the service area for electricity can be supplied in a reliable, efficient and economic manner by the Long Island lighting company (hereinafter referred to as "LILCO").
 Such excessive costs and lack of confidence have deterred commerce and industry from locating in the service area and have caused existing commerce and industry to consider seriously moving out of the service area.
 The decisions by LILCO to commence construction of the Shoreham nuclear power plant and thereafter to continue such construction were imprudent.
 The investment of LILCO in the Shoreham nuclear power plant has created significant rate increases, straining the economic capabilities of ratepayers in the service area, and likely will require further substantial rate increases if such plant is placed in service. It is uncertain whether the Shoreham nuclear plant ever will go into commercial service, or if it does whether its reliability, cost of construction, operation and maintenance will be such as to provide sufficient, reliable and economic electric service to ratepayers in the service area. The very substantial financial strain of the investment in the Shoreham nuclear plant has required LILCO to suspend dividends on its common and preferred stock, severely *Page 3 
threatening the continued economic viability of LILCO.
 For all the above reasons, a situation threatening the economy, health and safety exists in the service area.
 Dealing with such a situation in an effective manner, assuring the provision of an adequate supply of electricity in a reliable, efficient and economic manner, and retaining existing commerce and industry in and attracting new commerce and industry to the service area, in which a substantial portion of the state's population resides and which encompasses a substantial portion of the state's commerce and industry, are hereby expressly determined to be matters of state concern within the meaning of paragraph three of subdivision (a) of section three of article nine of the state constitution.
 Such matters of state concern best can be dealt with by replacing such investor owned utility with a publicly owned power authority. Such an authority can best accomplish the purposes and objectives of this title by implementing, if it then appears appropriate, the results of negotiations between the state and LILCO. In such circumstances, such an authority will provide safe and adequate service at rates which will be lower than the rates which would otherwise result and will facilitate the shifting of investment into more beneficial energy demand/energy supply management alternatives, realizing savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area. Moreover, in such circumstances the replacement of such investor owned utilities by such an authority will result in an improved system and reduction of future costs and a safer, more efficient, reliable and economical supply of electric energy. The legislature further finds that such an *Page 4 
authority shall utilize to the fullest extent practicable, all economical means of conservation, and technologies that rely on renewable energy resources, cogeneration and improvements in energy efficiency which will benefit the interests of the ratepayers of the service area.
Public Authorities Law §§ 1020-a. LIPA became responsible for the provision of electric service to its service area in 1998.
LIPA was created as a corporate municipal instrumentality of the State, a body corporate and politic, and a political subdivision of the State. Id. § 1020-c(1). It is governed by a board of trustees, one of whom is designated as chairman. Id. § 1020-d. The board is authorized to hire employees required for the performance of LIPA's duties without regard to any personnel or civil service law, rule, or regulation of the State but in accordance with guidelines adopted by LIPA, id. § 1020-e, and to prescribe their duties and qualifications and fix and pay their compensation, id.; see also id. § 1020-f(c).
In addition to specific grants of power, LIPA has been granted "all of the powers necessary or convenient to carry out the purposes and provisions" of the LIPA Act. Public Authorities Law § 1020-f. The provisions of the LIPA Act, "being necessary for the prosperity of the state and its inhabitants," are to be "liberally construed to effect [its] purposes." Id. § 1020-gg.
LIPA is generally not subject to oversight by the Public Service Commission,[2] the state governmental entity that regulates the provision of service by electrical corporations in New York. Public Authority Law § 1020-s(1); Public Service Law article 4.
[1] Another title 1-A governs the Green Island Power Authority.See Public Authorities Law §§ 1020-1020-w, 42 McKinney's Cons. Laws of N.Y. at 548-74 (2004).
[2] LIPA is subject to Public Service Commission regulation only to the extent that (1) article 7 of the Public Service Law applies to the siting and operation of a major utility transmission facility, (2) article 10 (formerly article 8) of the Public Service Law applies to the siting of a generating facility (now expired and repealed), and (3) section 18-a of the Public Service Law provides for assessment for certain costs, property, or operations. Public Authority Law § 1020-s(1). *Page 1